I am going to go ahead and call the first case 19-6161 United States v. Foust and Mr. Pincus we are ready when you are please identify yourself for the record oh and your microphone's off Mr. Pincus if you move your mouse on your screen and click it, it should show a picture of a microphone and a red line through it I think it's working I was clicking below that so I'm sorry about that Your Honor That's okay We're all learning Yes Good morning may it please the court my name is Howard Pincus from the Federal Public Defender and I represent Justin Foust For two independent reasons the district court erred in admitting testimony that linked Mr. Foust to fraudulent invoices The samples the expert used were by his own definition out of date and the prosecution did not show the methodology he applied to the samples was reliable This court should reverse Mr. Foust's convictions and remand for a new trial Mr. Linville the expert said that samples he used to compare with the known right the question documents should be contemporaneous which he defined which he said was within one to two years of the question He did not say that was an absolute firm rule he said that's what he would prefer He said it was his preference and what was in text that he owned He did not say that he said it was his preference And he said that Qualified the entire operation He said that not only was it his preference it was in text that he owned and he also said that the samples were not out of date because they were within one to two year And the prosecution it was its burden to prove that the samples were contemporaneous as the expert said was required and they didn't present anything else to show Other than the one to two years that the expert said that's what he said he needed to make the comparison that he relied on They the government's relying in part on the fact that this is not just science but based on experience and his experience taught him that it should be within one to two years and there was nothing other than one to two years that was offered For contemporaneous the only definition that the record shows of contemporaneous is what the expert said and that's one to two years, and there's no dispute that that that the samples here, all of them were outside of one to two years. Right. Well, you have one that was two years and two and a half months, and the other one is two years and eight and a half months so it's between two and three years on each of the samples. Well, we've taken the most prosecutor friendly view in that sense and yes, it, it might be off by two and a half months, it could be a bit more eight months on the other side, maybe a bit more for some of the samples that he compared to, but the point is, is he said that he wanted them within one to two years, and none were, there's no showing that he said the reason these were contemporaneous You move on to your next point. Well, the next point is that this is not, they never showed the reliability of the methodology that he used Before you move off of application I want to just clarify that the only argument you're making challenging his application of his methodology is the, whether the exemplars were contemporaneous. That's correct. Okay. That's correct. And it becomes just like Crutile, where the... In Crutile, he didn't complete the verification. He didn't conduct a Daubert hearing, nothing was offered to establish the ACE methodology was reliable, unlike this case. Well, nothing was offered here to show that using out of date samples would produce a reliable result. There, the problem was the methodology. That's correct, Your Honor. Here, the problem is with the data that the methodology was applied to. It's the same thing, if you have an improper or not shown to be reliable methodology, or not reliable data. This court's authority teaches that the opinion that results is unreliable and shouldn't be admitted. So it is comparable to Crutile and the fact that there was no hearing in Crutile, there was an attempt to use deposition testimony to resolve it. And there was some, nothing by the expert about how he didn't, she didn't need to use the verification. Here, there's nothing to show that using unreliable out of, or out of time data would still produce a reliable result. That's what makes this case comparable to Crutile. The second problem is that the prosecution didn't show that the methodology used was reliable. The, none of the five, the five Daubert factors do not establish that here. There was nothing at all on testing. Mr. Pincus, isn't reliability of the weight to be given to the testimony up to the jury? Once it passed the Daubert threshold, absolutely, but it still has to preliminarily be shown to be sufficiently reliable to go to the jury. At that point, issues about how problems with the, the, you know, the strength of the samples and some issues that might be had with the data and the methodology, those are for the jury. But first, it has to be shown to me sufficiently reliable to even go to the jury. And that's the problem here. There was nothing shown at all about testing, even though the government seems to admit that it can be tested, handwriting analysis. On peer review, we have almost nothing too. We just have that Mr. Linville was a guest on the advisory board of a peer review journal. We don't have anything about peer review with respect to what's at issue here, which is identifying somebody as the author of a forged document. Is it fair to say under Kumho-Tyre that the Daubert factors don't necessarily all apply in every expert context? That's true from Daubert itself. These, Daubert is not checklist. The, the, how much each, what factors are relevant will depend on the case. But the government hasn't pointed to anything beyond the Daubert factors that show reliability here. And if you look at the Daubert factors, they don't show reliability as the government's burden to establish that the methodology used here was sufficiently reliable. For example, Back to reliability, our standard review is different than the application, isn't it? We have a heavy deference to the trial court where the court has gone through a Daubert hearing and looked at all of the information. Would you agree with that statement? Well, I agree that the review on, on the methodology is abuse of discretion. Yes. And the only thing that the court here said about the methodology being reliable is he's shown me that there's a methodology that he's not picking, just picking stuff out of the air, that it's just his ipsy dixit that this is, you know, that these match. And what the court was relying on. Was primarily the court was saying this is a comparison test and the court and it's his experience in making such comparisons. That is his methodology that over the years he has developed an expertise in making this comparison. And he testified about all the things, the loops and the spaces and the backwards slants that he used to reach his opinion. Isn't that a methodology? It's a methodology, but it's not one that we have any way of knowing is anything beyond what he says it is. There's if there is the government admits that this could be tested. There hasn't been showing of testing the peer review as to what he did. They didn't present any evidence of peer review in this specific context. Error rates. We don't know what the error rate he referred to went to because he never discussed it. The standards, he said, there's standards out there, but they're pretty basic. He just cited one, the ASTM standards, and he said some labs don't even use them. They don't find them to fit with what they do. So we really don't know that it's anything more than him saying this is what I do. These are differences I've noticed. And I'm telling you, you can trust me that this matches up and supports my conclusion. And that's really what the district court did here. It says he's shown me stuff and I can see it. I can see that there are these loops. To me, it looks like black magic, but he sees these things and they're there. So therefore, his methodology is reliable. But we need more to allow expert testimony. It can't just be that the witness says, I've done this for years and this is what I've noticed. And this is significant. The significance should be stuff. Is this like United States v. Baines and fingerprint evidence where the court basically said, you know, it's been used in court proceedings, criminal investigations, and other practical applications for years and we have determined by that use that it's reliable? No, I don't think so. There's been a lot of criticism recently about handwriting analysis and how it is not based in science. The National Academy of Science has said we need more testing on this. Fingerprint evidence has much more of a lineage in the federal courts and there's much more that people point to in it. However, they didn't show that it matches up in that same way. Maybe the government could do that. But the problem is that it didn't do it here. If it wanted to show that these things that he identified are things that handwriting experts say, based on some data, based on some testing, based on more than just his experience, allows somebody to make a conclusion about who wrote a particular document, the government should have produced that evidence. And the problem here is that they didn't. There's very little... Did you raise methodology in the district court hearing? Yes. And in fact, the district court said all you have to do is to say that you're challenging it and then it's up to the government to prove it. Well, the court said it's using accepted methodologies. That really has not been questioned here. Now, did you question it or not? Well, we questioned it by... At the beginning, the court said, are you challenging its qualifications? We said, no, it's just about reliability. And the court viewed it as, once we filed the motion, burden on the government. And the government has an argument that it's not preserved. So even if it weren't, they would have weighed that argument here. So this court's review is certainly for abuse of discretion. And the district court went through and made a determination on reliability. As I've said, that determination was really nothing more than he's shown me stuff that I can see, and therefore it's reliable. But it doesn't have any footing in the Daubert standards. And the government doesn't point to anything else that would allow the methodology to be taken as reliable. This is more along the lines of the Cuomo Tire Company situation. It's not a pure scientific... It may not be pure science, but it is... It's not pure science at all. The expert said, at page 60 of volume two, that it was scientific. And the court said it's his craft and his science. So there is a scientific component, but either way, the court in Cuomo Tire said you still have to go through and establish the reliability. And that's what wasn't done here. Now, this evidence was stressful. The problem is that reliability is a jury question. It's not a question of law. And if you could vigorously cross-examine and convince the jury that what this guy was saying is not based on anything, you might have made it. It's certainly a jury question once they pass the threshold, once it's sufficiently reliable to go to the jury. And that's what we're questioning here. What we're challenging here is that it's not. And this is evidence they relied on in summation. This is evidence that was likely to have great impact given how much time the expert said he spent on this, his 30 years of experience, his use of jargon. Their argument that there was inside knowledge here actually cuts against Mr. Faust being the one who committed the fraud, because his inside knowledge, he wouldn't have committed a fraud in a way that would be so easy to catch. And there were also invoices submitted days after he was aware that Chesapeake was looking into. And I also want to say that the fact that the jury hung on the Willis accounts is something this court could consider. Now, Kristerna Gonzalez, this court did say that we don't know why a jury hung. It could be an irrational, a single irrational juror. But this court doesn't presume irrationality on jurors. It presumes the opposite. And in many cases, and I'll submit a 28-J letter outlining them, this court has considered the length of deliberations, jury struggle, and reaching a verdict. And here we have the jury hanging on counts where Mr. Linville couldn't identify anybody because, as the author, because they were cut and paste forgeries, and convicting where he did identify Mr. Faust. So we asked the court to reverse Mr. Faust's convictions and remand for a new trial. Thank you. Ms. Perry, we are ready when you are. Where did Mr. Pincus go? I don't know. I can stay here. Good morning. May it please the court. My name is Jessica Perry, and I am appearing on behalf of the United States of America. Ms. Perry, I have to tell you, I think the government did a pretty sloppy job of putting on its expert here. Well, there's not much. I mean, it's sort of like we all assume we all know handwriting expertise comes in and I'm not going to go through the motions. And oh, yeah, there's some study. I'm not going to even name the study for you that says this stuff works. I mean, I, you know, I recognize it's a difficult standard of review for the defendant. But I was really surprised by the minimal effort made here to support this testimony. Your Honor, I will concede that if if this is a case where the court thinks that strict application of the Dobbert factors should apply, that the record is not as elaborate, not as developed as I would like it to be for the strict application of the Dobbert factors. Well, even under Kumo Tire, it's it's pretty minimal. Your Honor, the methodology at issue in this case with Mr. Linville is not a terribly complex methodology, as the court has noted that the methodology in this case is the comparison. And with respect to the the comparison methodology that Mr. Linville used, I do think the record is adequate to have shown the district court what he was comparing the the exemplars he was relying upon, how he analyzed those and it with respect to the specific areas of comparison that he found to Mr. Faust handwriting there. Those were, I think, adequately developed in the Dobbert hearing for the district court, at least enough to cross the reliability threshold. Now, you know, he said that, you know, he likes to have two dozen exemplars is what he typically requests. I mean, in one instance, he had only one and the other he had two. And I know that goes to application, but honestly, I was this is the was really seemed to me to be an assumption that handwriting expertise comes in all the time and I don't really need to do anything to get it in. Am I being unfair? I mean, I thought this was a very weak record in terms of meeting the the gateway threshold here. Your Honor, like I said, you know, Mr. Linville testified about his comparison analysis. You know, it's true that we didn't present, you know, copies of articles about error rates and and all of those sorts of things as though the Dobbert factors strictly apply. But as we've argued under United States v. Baines, just as just as the court has said, the Dobbert factors don't have to be strictly applied with respect to fingerprint fingerprint evidence. I think the same is true here. So for the government to present at a Dobbert hearing, all of that information, as though those factors apply when we don't think they do. I think is would be requiring more than what's necessary in this case when when the methodology that's being employed, employed is a simple comparison. And the district court was walked through that comparison and how the expert performed his analysis. I do think it was sufficient to cross the at least the initial threshold for admissibility. I would like to address if I could. The appellant has challenged the the data that Mr. Linville has relied upon. And in particular, whether or not they met the contemporary contemporaneous requirements that he he testified was his personal preference. I do think that this is a case where the appellant is trying to take the crude tile case that came out after the Foust case went to trial and try to fit the facts of our case to crude, crude tile. Well, one of the problems I have applying crude tile here is that I have a hard time really identifying clearly what Mr. about it. You know, I'm I'm not sure whether he follows ASTM standards. He says some people do. Some people don't. I don't know. You know, apparently, although he typically has a dozen exemplars, sometimes he relies on one. And so it's really hard to do a strict application to say, did he go through all the steps of his methodology when his methodology was so sloppily provided in the Daubert hearing. Well, didn't Mr. Linville testify specifically that he follows the American Society of Testing and Materials Standards, but recognizes that they're fairly basic and not hard and fast rules. That was his testimony, Your Honor. You know, and again, going back to the comparison analysis, as some of the cases that the government has cited in its brief note, it really is just a comparison methodology. And courts have noted that in the context of handwriting analysis, jurors, through their everyday experience, have some experience to draw upon to be able to, on their own, also assess the reliability and credibility of the handwriting analysis as it's performed. And in this case, I think that was certainly true. At trial, the government, I think, actually did a better job at trial walking the jury through Mr. Linville's comparison analysis and the various areas of similarity that he recognized between Mr. Faust's exemplars and the question signatures at issue in this case. Going back to the data argument that Mr. Pincus has raised, again, as we said in our briefing, Mr. Linville testified that the contemporaneous requirement was his personal preference. And I do want to point out that I think the appellant has taken his testimony a little bit out of context. When Mr. Linville conducted his analysis, he did so well before there was ever a criminal case. He was conducting his analysis in connection with civil litigation, and he testified that he looked at, you know, 1,100-plus invoices, some of which indisputably fell within that two-year window. So he's testifying broadly about his analysis. It wasn't until later when the government selected particular invoices to charge in the criminal case that specific invoices became an issue. And in terms of the contemporaneous requirement as applied to those six particular Gene Putnam signatures that were charged in the indictment, I don't think that the defendant in this case raised that contemporaneous argument with respect to those specific invoices and did not challenge that in the district court below. When Mr. Linville was cross-examined at the Daubert hearing, he said that he felt like he had adequate materials to conduct his analysis, and that testimony was unchallenged by defense counsel in the Daubert hearing and at trial. Well, and Crane, the expert, thought that she had done everything she needed to do to be able to opine also, and we said, well, you dropped off a step, a complete step of your methodology, and that doesn't work. So I'm not sure the expert gets to say, you know, to verify that this is reliable. I would respond to that with two things, Your Honor. I do think, although we have certainly not raised a plain error argument in our briefing, I do think that when you're talking about an abuse of discretion standard, to overturn a jury conviction on a contemporaneous argument that was never really raised with the district court below when, you know, when you have an abuse of discretion standard that where a court should be given substantial deference, I think that is something for the court to consider. And also, with respect to in the Crutile case, you know, it's true that the expert testified that the verification step, in her view, wasn't necessary, but as the court has noted, the exemplars at issue in this case were only slightly outside of the window through which Mr. Linville said he would have preferred them to be. He also testified about the concept of graphic maturity and how as someone reaches graphic maturity, their handwriting is unlikely to change absent a change of circumstances like, you know, disease or intoxication. So the fact that these signatures were, you know, in one case, two and a half months outside that window, I think that's fertile ground for cross-examination. I don't think it significantly undercuts the reliability of his testimony. Whereas in Crutile, the court could say one way or the other, whether the expert's failure to conduct the last step of her analysis, they felt like that could have altered the reliability of her testimony. Overall, as the government has said in its briefing, you know, the appellant's position in this case is based upon this court strictly applying the Dawbert factors as though handwriting analysis is a true science. It's not. And I think consistent with United States v. Baines as applied to fingerprint testimony, the court should not strictly apply the Dawbert factors here. And, you know, with the highly deferential abuse of discretion standard, the government believes that Mr. Faust's conviction should be upheld. The appellant has raised some district court opinions from other circuits where handwriting analysis has been called into question. But I don't think that those other district court opinions necessarily mean that the district court in this case abused its discretion. If you look at the United States v. Mallory case from the Sixth Circuit, the court in that case upheld a handwriting expert, acknowledging that there has been some further scrutiny of handwriting analysis in other places. But in that case, the court nevertheless upheld the handwriting expert under the abuse of discretion standard. Counsel, can I get you to address the harmless error issue? Sure. Mr. Faust has argued that should the court strictly apply the Dawbert factors to this case, that Mr. Linville's testimony ought to be excluded. And as a result, there is not harmless error. As we've argued in our brief, we think there was overwhelming other evidence sufficient to convict Mr. Faust. But the evidence was the same with regard to Mr. Putman, except Mr. Linville was not able to give an expert opinion with respect to him, and the jury acquitted on him, right? The jury did not acquit on the counts involving a Jeff Willis signature. The jury hung. We have no way to know at this point what the jury was thinking. As we've argued, it would be speculation to assume that it was solely related to Mr. Linville's testimony. I will acknowledge that I think the harmless error, if you get to that, is a close question in this case. But again, I don't think that's a question the court needs to reach because as we've argued, in order to get there, the government believes it would require a strict application of the Dawbert factors that just aren't appropriate for handwriting analysis in this case. Thank you. Unless the court has further questions, obviously, we believe that the court should affirm the district court's admission of the handwriting expert and affirm Mr. Faust's conviction in this case. Judge Kelly, do you have any questions? No, I do not. No, I'm good. Thank you. Thank you, counsel. We will take this matter under advisement and issue a decision as soon as we can. Thank you. I thought I had a question. Do you have time, Karen? Not much. Okay, you do have 21 seconds. I apologize. I don't want to take you 21 seconds. Very quickly, the government says the samples were indisputably within the window, some of them. There were 1,188. 633 were Putnam invoices. And as we've shown, we argued in the brief, there was no showing the Dawbert hearing that those were within the two-year window. Slightly outside the window, that would be for the expert to say that it didn't matter. And the fact there's been further scrutiny on this means the government had to have done a better job. They were on notice and they didn't do it. Thank you. Thank you, counsel. Now we'll take it under advisement.